ACCEPTED
13-15-00011-cv
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
2/6/2015 4:07:32 PM
DORIAN RAMIREZ
CLERK

# No. 13-15-00011-CV

**In the**

**THIRTEENTH COURT OF APPEALS**

**Corpus Christi, Texas**

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
2/6/2015 4:07:32 PM
DORIAN E. RAMIREZ
Clerk

*David P. Desenberg, Flatmax Energy, L.P., Flatmax Oil & Gas, L.L.C., Keith H. Baker, Reagan Rich, Big Reef Energy, LLC*

*Appellants,*

*v.*

*Everest Resource Company, C-5 Oil & Gas, Ltd.,*

*Appellees*

*On interlocutory appeal from Cause No. 2014-DCV-5125-G, in the 319th Judicial District Court of Nueces County, Texas*

APPELLANTS' BRIEF ON INTERLOCUTORY APPEAL OF A TEMPORARY INJUNCTION

R. LAURENCE MACON
State Bar No. 12787500
ATTORNEY FOR APPELLANTS
DAVID P. DESENBERG, FLATMAX
ENERGY, L.P., FLATMAX OIL & GAS,
L.L.C., KEITH H. BAKER, REAGAN
RICH, BIG REEF ENERGY, LLC

*February 6, 2015*                    ***Oral Argument Requested***

## Identity of Parties and Counsel

| Appellants: | Represented by: |
|---|---|
| David P. Desenberg, Flatmax Energy, L.P., Flatmax Oil & Gas, L.L.C., Keith H. Baker, Reagan Rich, Big Reef Energy, LLC | R. Laurence Macon<br>Janie A. Shannon<br>Dennis J. Windscheffel<br>Akin Gump Strauss Hauer & Feld, LLP<br>300 Convent Street, Suite 1600<br>San Antonio, Texas 78205 |
| **Appellees:** | **Represented by:** |
| Everest Resource Company, C-5 Oil & Gas, Ltd. | Reagan W. Simpson<br>Christian J. Yard<br>Yetter Coleman LLP<br>909 Fannin, Suite 3600<br>Houston, Texas 77010<br><br>Roger S. Braugh, Jr.<br>Jason P. Hoelscher<br>Brantley W. White<br>Craig M. Sico<br>Sico, White, Hoelscher, Harris & Braugh LLP<br>802 N. Carancahua, Suite 900<br>Corpus Christi, Texas 78401 |

# TABLE OF CONTENTS

I.     STATEMENT OF FACTS ........................................................................... 1

    A.     Plaintiffs C-5 and Everest ................................................................. 1

    B.     Everest's Business is Limited to Oil and Gas Prospects Located
            Along the Gulf Coast of Texas. ........................................................ 1

    C.     Defendants ......................................................................................... 2

    D.     Defendants Desenberg and Baker Join Everest and C-5; Plaintiffs
            Were to Have Only Limited Use of Desenberg's Data;  Desenberg's
            Data Has Nothing to Do with the Alabama Prospect. ....................... 3

    E.     Desenberg's and Baker's Agreements with C-5 and Everest. .......... 4

    F.     Plaintiffs Treat Defendants Desenberg, Baker, and Investors Poorly;
            Desenberg and Baker Each Independently Decide to Leave Everest
            Before Hearing About the Alabama Prospect. ................................... 7

    G.     Defendants Desenberg and Baker Do Not Hear About the Potential
            Alabama Prospect Until the Last Few Weeks of Their Employment
            With Everest; and Do Not Use Any Everest Resources in Exploring
            the Possibility of The Alabama Prospect ........................................... 8

    H.     Defendants Facilitate and Purchase a Right of Assignment to a 40%
            Working Interest in the Alabama Prospect on Behalf of Investors
            Who Were Bona Fide Purchasers And Who Had No Interest in
            Doing Business With Everest. ........................................................... 12

    I.     Contrary to Plaintiffs' Claim, Defendants Did Not Take Any
            Confidential Investor List or Improperly Download A Google Earth
            File ................................................................................................... 15

    J.     Defendants Have Received a Drilling Proposal And Are Required to
            Act in Order to Develop And Preserve the Alabama Prospect ........ 16

II.    SUMMARY OF THE ARGUMENT ..................................................... 18

III.   ARGUMENT AND AUTHORITIES ..................................................... 19

    A.     Tex. R. Civ. P 681 and 683. ........................................................... 19

        1.     The Injunction Is Void As It Violates Tex. R. Civ. P. 681 and 683. ........... 22

        2.     Trial Court Also Abused Its Discretion in Granting Injunctive
            Relief Relating to the Alabama Prospect As Appellees Failed To
            Meet Required Elements Necessary For Injunctive Relief ........................ 36

        3.     A Balancing of the Equities Necessitates That the Injunction be
            Dissolved With Respect to the Alabama Prospect. ................................. 38

        4.     The Temporary Injunction Must Be Dissolved As It Fails to
            Preserve the Status Quo and Threatens the Entire Alabama
            Prospect as Well as Recovery for Any Party. ........................................ 41

    B.     The Trial Court Abused Its Discretion by Setting a Low Bond. ................. 45

**IV.** PRAYER ................................................................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alliance Royalties, LLC v. Boothe,*
313 S.W.3d 493 (Tex. App.—Dallas 2010, no pet.) ....................................30, 33

*Am. Mfrs. Mut. Ins. Co. v. Schaefer,*
124 S.W.3d 154 (Tex. 2003) ...................................................................30

*Amason v. Woodman,*
498 S.W.2d 142 (Tex. 1973) ..................................................................30

*American Derringer Corp. v. Bond,*
924 S.W.2d 773 (Tex. App.—Waco 1996, no writ)....................................33, 35

*Auto Wax Co v. Byrd,*
599 S.W.2d 110 (Tex. App.—Dallas 1980, no writ)..................................33, 35

*Ballenger v. Ballenger,*
694 S.W.2d 72 (Tex. App.—Corpus Christi 1985, no writ.) ...........................45

*Barnstone v. Robinson,*
678 S.W.2d 562 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd)............45

*Bayoud v. Bayoud,*
797 S.W.2d 304 (Tex. App.—Dallas 1990, writ denied)..................................46

*Biodynamics, Inv. v. Guest,*
817 S.W.2d 128 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by
agrmt) .................................................................................................47

*Boswell v. Farm Home Sav Ass'n,*
894 S.W.2d 761 (Tex. App.—Forth Worth 1994, writ denied) ........................31

*Butnaru v. Ford Motor Co.,*
84 S.W.3d 198 (Tex. 2002).....................................................................41

*DeSantis v. Wackenhut Corp.,*
793 S.W.2d 679 (Tex. 1990) ...................................................................46

*Dev. Co., Inc. v. Gerfers,*
    487 S.W.2d 219 (Tex. Civ. App.—San Antonio 1972, writ ref'd n.r.e.)..........40

*Edgewood Indep. Sch. Dist. v. Paiz,*
    856 S.W.2d 269 (Tex. App.—San Antonio 1993, no writ)................................45

*Elliot v. Lewis,*
    792 S.W.2d 853 (Tex. App. Dallas 1990, no writ)............................................22

*ERI Consulting Engineers, Inc. v. Swinnea,*
    318 S.W.3d 867 (Tex. 2010) ...........................................................................30

*Ex parte Slavin,*
    412 S.W.2d 43 (Tex. 1967).............................................................................20

*Fairfield v. Stonehenge Ass'n,*
    678 S.W.2d 608 (Tex. App.—Houston [14th Dist.] 1984, no writ).............21, 29

*Foxwood Homeowners Ass'n v. Ricles,*
    673 S.W.2d 376 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) ........41

*Franklin Savs. Ass'n v. Reese,*
    756 S.W.2d 14 (Tex. App.—Austin 1988, no writ) ..........................................47

*Gill v. Hudspeth County Conservation & Reclamation Dist. No. 1.,*
    88 S.W.2d 517 (Tex. Civ. App.—1935)...........................................................45

*GTE Mobilnet of South Tex. Ltd. Part'p v. Cellular Max, Inc.,*
    123 S.W.3d 801 (Tex. App.—Beaumont, 2003, pet dism'd)............................47

*Hall v. Seal,*
    No. 04-09-00675-CV, 2011 WL 61631 (Tex. App.—San Antonio 2011,
    pet. denied)....................................................................................................41

*Harbor Perfusion, Inc. v. Floyd,*
    45 S.W.3d 713 (Tex. App.—Corpus Christi 2001, no pet.).........................21, 29

*Hogue v. City of Bowie,*
    209 S.W.2d 807 (Tex. Civ. App.—Fort Worth 1948, writ ref'd n.r.e) .............40

*Holubec v. Brandenberger,*
    111 S.W.3d 32 (Tex. 2003)..........................................................21, 24, 25, 26

*In re Fluor Enterprises, Inc.,*
    2011 WL 2463004 (Tex. App.—Corpus Christi 2011, orig. proceeding) .........21

*Interfirst Bank San Felipe, N.A. v. Paz Constr. Co.,*
    715 S.W.2d 640 (Tex. 1986) ..................................................................20

*Johnson v. Snell,*
    504 S.W.2d 397 (Tex. 1974) ..................................................................40

*Ladner v. Reliance Corp.,*
    293 S.W. 2d 758 (Tex. 1965) ................................................................28

*Law Funder, LLC v. Law Offices of Doug Allison,*
    2014 WL 895512 (Tex. App.—Corpus Christi March 6, 2014, no pet.) ..........34

*Legacy Home Health Agency, Inc. v. Apex Primary Care, Inc.,*
    2013 WL 5305238 (Tex. App.—Corpus Christi 2013).....................................34

*Living Christ Church, Inc. v. Jones,*
    734 S.W.2d 417 (Tex. App.—Dallas 1987, writ denied) .................................40

*McCharen v. Bailey,*
    87 S.W.2d 284 (Tex. App.—Eastland 1935, no writ) ........................................28

*NMTC Corp. v. Conarroe,*
    99 S.W.3d 865 (Tex. App.—Beaumont 2003, no pet.) .....................................41

*NRG Exploration, Inc. v. Rauch,*
    671 S.W.2d 649 (Tex. App.—Austin 1984, writ ref'd n.r.e.) ...........................31

*Nueces County Drainage & Conservation Dist. v. Bevly,*
    519 S.W.2d 938 (Tex. Civ. App.—Corpus Christi 1975, ref. n.r.e.) ...........37, 40

*PILF Invs. v. Arlitt,*
    940 S.W.2d 255 (Tex. App.—San Antonio 1997, no writ)..........................22, 28

*Qwest Commc'ns Corp. v. AT&T Corp.,*
    24 S.W.3d 334 (Tex. 2000)......................................................................19

*Ratcliff v. Mahres,*
    122 S.W.2d 718 (Tex. Civ. App.—El Paso 1938, writ ref'd) ...........................30

*Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.,*
   374 S.W.3d 488 (Tex. App.—Dallas 2012, no pet.) ...................................passim

*San Antonio Bar Ass'n v. Guardian Abstract & Title Co.,*
   291 S.W.2d 697 (Tex. 1956) ...................................................................20

*State v. Southwestern Bell Tel. Co.,*
   526 S.W.2d 526 (Tex. 1975) ...............................................................41, 43

*Storey v. Central Hide & Rendering Co.,*
   226 S.W.2d 615 (Tex. 1950) ...................................................................37

*Sun Oil Co. v. Whitaker,*
   424 S.W.2d 216 (Tex. 1968) ...................................................................36

*Swanson v. Grassedonio,*
   647 S.W.2d 716 (Tex. App.—Corpus Christi 1982, no writ) ...........................31

*Townplace Homeowners' Assoc., Inc. v. McMahon,*
   594 S.W.2d 172 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) ........................................................................................................41

*Walling v. Metcalfe,*
   863 S.W.2d 56 (Tex. 1993)......................................................................36

**STATUTES**

§ 51.014(a)(4) of the Texas Civil Practice & Remedies Code ...............................ix

**RULES**

Tex. R. Civ. P. 63.....................................................................................21

Tex. R. Civ. P. 681.............................................................................passim

Tex. R. Civ. P. 683.............................................................................passim

Tex. R. Civ. P. 684.....................................................................................46

# APPENDIX

TAB A:      November 21, 2014 Order Granting Temporary Injunction

## STATEMENT OF THE CASE[1]

***Nature of the Case***:   This is an interlocutory appeal of a temporary injunction entered by a trial court.  This interlocutory appeal is brought pursuant to Section § 51.014(a)(4) of the Texas Civil Practice & Remedies Code.

The instant case primarily involves a dispute over rights to an assignment of a 40% working interest in an oil & gas prospect located in the state of Alabama (the "Alabama Prospect").  Plaintiffs sought and obtained a temporary injunction enjoining Defendants from engaging in various activities, including transferring any working interest to bona fide purchasers, as well as the merger of entities otherwise required for contractual compliance and continued development of the Alabama Prospect.

Appellants are appealing subsections (a)-(f) of Paragraph 35 of the Temporary Injunction Order.

***Course of Proceedings:***   The trial court conducted a temporary injunction hearing intermittently over the course of November 19-21, 2014.   At the conclusion of the temporary injunction hearing, the Hon. David Stith 319th

---

[1] Record cites used in this brief are as follows: App.–Appendix; CR–Clerk's Record; RR–Reporter's Report; PX–Plaintiffs' hearing exhibits; DX–Defendants' hearing exhibit.

Judicial District Court of Nueces County, entered a temporary injunction against Appellants on November 21, 2014.[2]

Defendants thereafter requested and obtained a setting for a hearing to modify and/or dissolve the temporary injunction. However, on the day of the setting, the trial court informed the parties it would be unable to hear Defendants' motion and request.[3] In order to preserve Defendants' rights, Defendants filed a notice of appeal that same day as required under the Texas Rules of Appellate Procedure.

Defendants thereafter were able to reset their prior request to modify and/or dissolve the temporary injunction for December 29, 2014. At the hearing, however, Plaintiffs objected to any request for the Court to modify the temporary injunction, on the basis that the appellate court was the proper court to modify the temporary injunction. The trial court agreed and otherwise denied Defendants' additional request to dissolve the temporary injunction.[4]

---

[2] CR 569; App. A. The temporary injunction order was signed by Judge Missy Medary per Judge Stith's request as Judge Stith was required to leave at the conclusion of the hearing in order to attend a previously scheduled event.

[3] The trial court referred the parties to a visiting judge. However, given the complexity of the case, and the fact that the visiting judge would be unfamiliar with the case and issues, Defendants elected to reset the hearing before Judge Stith.

[4] Appellants are appealing the trial court's original grant of the temporary injunction order and also request that the appellate court review the trial court's subsequent refusal to dissolve the temporary injunction. *See* TRAP 29.6.

# ORAL ARGUMENT

The issues presented in this appeal have significant implications for the rights and remedies available to the parties. Oral argument is warranted and will assist the Court in resolving important questions to be decided.

# ISSUES PRESENTED

(1)  The trial court abused its discretion in entering a temporary injunction because the temporary injunction order did not comply with Tex. R. Civ. P. 683, in that the order lacked requisite specificity, was overly broad, restrained parties not before the court, and sought relief that was not specifically plead for;

(2)  The trial court abused its discretion in entering a temporary injunction because the temporary injunction order does not comply with Tex. R. Civ. P. 681;

(3)  The trial court abused its discretion in entering a temporary injunction relating to the Alabama Prospect that fails to preserve the status quo;

(4)  The trial court abused its discretion in entering the temporary injunction relating to the Alabama Prospect because Appellees failed to prove probable, imminent, and irreparable injury;

(5)  The trial court abused its discretion in entering the temporary injunction relating to the Alabama Prospect because a required balancing of the equities weighs against an injunction due to the catastrophic and irreparable injury that all parties will suffer as a result of the temporary injunction; and

(6)  The trial court abused its discretion in granting a low bond in the amount of $10,000.

## I. STATEMENT OF FACTS

### A. Plaintiffs C-5 and Everest.

Plaintiff C-5 Oil & Gas, Ltd. ("C-5") is an investment company that invests in oil and gas properties.[5] C-5 is the primary funder of Plaintiff Everest Resource Company ("Everest").[6] Everest, in turn, is a small, independent oil and gas exploration and production company based in Corpus Christi, Texas.[7] Jimmy Clark ("Clark") is the President and CEO of Everest Resource Company.[8] Through Clark-Durham Operations LLC, Clark is also involved as a general partner of C-5.[9] Clark and Tom Crain ("Crain"), who operates as Everest's Chief Operating Officer, make all the decisions and effectively run C-5 and Everest.[10]

### B. Everest's Business is Limited to Oil and Gas Prospects Located Along the Gulf Coast of Texas.

Everest publicly advertises itself as a company that generates, buys, drills, and operates oil and gas prospects primarily along the Gulf Coast of Texas.[11]

---

[5] *See* RR Vol. 7, PX—23 (C-5 Oil & Gas Partnership Agreement).

[6] *See* RR Vol. 3 at pg. 48.

[7] *See* RR Vol. 4 at pgs. 82-83; RR Vol. 7, DX-14 (Print Out from Plaintiff Everest's Website).

[8] *See* RR Vol. 4 at pgs. 50-51.

[9] *See id.*

[10] *See* RR Vol. 3 at pg. 43.

[11] *See* RR Vol. 4 at pgs. 82-83; RR Vol. 7, DX-14 (Print Out from Plaintiff Everest's Website).

Everest's current prospects are all located in Texas.[12] Everest has not done any oil and gas operations outside the state of Texas for at least the last twenty years.[13]

Everest as a business is incredibly risk averse, and centers on using other people's money for oil and gas prospects.[14] Everest's philosophical business model involves exploiting investors for up-front money.[15] Indeed, Everest publicly advertises that the typical Everest deal is "Reimburse Everest for G&G costs, turnkey well costs, Everest carry to Casing Point."[16]

### C.    Defendants.

Defendants Keith Baker ("Baker") and Flatmax Energy, L.P. ("Flatmax") are limited partners in C-5.   Flatmax Energy, L.P. is a company controlled by Defendant David Desenberg ("Desenberg").[17]   Other Defendants to this appeal include Defendant Flatmax L.L.C., which is a company operated by Desenberg; Reagan Rich who is Desenberg's stepson-in-law; and Defendant Big Reef Energy, L.L.C. ("Big Reef") which is a company managed by Defendants.[18]

---

[12] *See* RR Vol. 4 at pg. 83.

[13] *See id.*

[14] *See* RR Vol. 3 at pgs. 55-57; Vol. 4 at pgs. 83-84; RR Vol. 7, DX-14 (Print Out from Plaintiff Everest's Website).

[15] *Id*.

[16] *See* RR Vol. 4 at pgs. 83-84; RR Vol. 7, DX-14 (Print Out from Plaintiff Everest's Website).

[17] *See* RR Vol. 2 at pgs. 22, 25.

[18] Defendant Big Reef Energy entered into various participation agreements with third-party investors regarding the Alabama Prospect.  *See* RR Vol. 7, DX 6-8 (Participation Agreements between Big Reef Energy, LLC and third-party investors who are not before the Court).  Big Reef Energy owns 100% stock of Petrodome Alabama II, LLC, the entity which holds rights to

**D.** **Defendants Desenberg and Baker Join Everest and C-5; Plaintiffs Were to Have Only Limited Use of Desenberg's Data; Desenberg's Data Has Nothing to Do with the Alabama Prospect.**

Defendants Baker and Desenberg have each been in the oil and gas business for many years.[19] In 2012, Desenberg and Baker each explored potential business dealings with Everest and C-5. Desenberg joined C-5 and Everest because of the seismic data he had and because he was hoping to find a company that would participate with him in developing prospects from that data.[20] Desenberg's database of seismic data dealt with a few counties in South Texas.[21] Desenberg's database did not have anything to do with the Alabama Prospect.[22] On paper, it seemed like a good fit. Prior to Desenberg and Baker joining C-5 and Everest, Everest had had limited success in the drilling business. In fact, Crain stated many times that Everest had drilled 40 dry holes in a row.[23]

While Desenberg was working with Everest and partnering with C-5, some of his seismic data was made available for exploration benefit.[24] However,

---

the assignment of the 40% working interest. *See* RR Vol. 7, DX-5 (Renpetco Participation Agreement); RR Vol. 7, DX-10 (stock purchase agreement).

[19] *See* RR Vol. 4 at pg. 41.

[20] *See* RR Vol. 3 at pg. 35.

[21] *See* RR Vol. 3 at pg. 13.

[22] *See id.*

[23] *See* RR Vol. 3 at pg. 60.

[24] *See* RR Vol. 3 at pg. 35.

Desenberg did not have any intention of selling or contributing that data.[25] Moreover, it was only to be available for projects in which Desenberg had an interest.[26] Desenberg repeatedly made clear to the people at C-5 and Everest and even documented in writing that Flatmax owned the data.[27] Indeed, two days after Desenberg and Baker left Everest, Desenberg informed Geotrace—a firm that was reprocessing some of Desenberg's data—that Flatmax was the rightful owner of that data, and that the data needed to stay with Flatmax.[28] Crain and Clark who were carbon copied on the e-mails did not voice any objection or otherwise claim that Desenberg's statements were inaccurate.[29] Indeed, at no time did either Clark or Crain ever contact Desenberg to claim that Desenberg was wrong about Flatmax's ownership of the data.[30]

### E. Desenberg's and Baker's Agreements with C-5 and Everest.

In September 2012, Desenberg started employment with Everest without any sort of agreement.[31] Therefore, on October 25, 2012, Desenberg and Baker signed

---

[25] *See id.*

[26] *See id.*

[27] *See* RR Vol. 7, DX-2 (Email to Clark & Crain); RR Vol. 3 at pg. 38.

[28] *See* RR Vol. 6, PX-9 (Email to Mr. Perry of Geotrace, with Copies to Clark, Crain & Baker); RR Vol. 2 at pgs. 56-57.

[29] *Id.*

[30] *See* RR Vol. 3 at pgs. 38-40. In addition to allowing Everest to use his data, Mr. Desenberg also put down $250,000 towards C-5. *See id.*. To date, Mr. Desenberg has received zero money back for use of his data and being a partner in C-5. *See id.* at pg. 41.

[31] *See* RR Vol. 2 at pg. 22.

a C-5 Partnership Agreement and as well employment agreements.[32] The C-5 Partnership Agreement and the Employment Agreements were drafted by an attorney for Everest.[33] The understanding of the parties was that the Defendants would be free to pursue other oil and gas interests.[34] This intention of the parties was memorialized in the C-5 Partnership Agreement (to which Flatmax and Defendant Baker were signatories). Specifically, Section 5.5 of that agreement states, in relevant part, that "all partners may pursue other business and interests without regard to the partnership."[35]

As a result of Desenberg bringing data to the venture, Desenberg's employment agreement with Everest contained a unique provision which was meant to allow Everest to potentially pursue prospects using Desenberg's data within three counties in South Texas.[36] This intention was memorialized in Section 7 of Mr. Desenberg's Agreement which provides in relevant part:

---

[32] *See* RR Vol. 6, PX-1 (Desenberg Employment Agreement); RR Vol. 6, PX-2 (Baker Employment Agreement); RR Vol. 6, PX-23 (C-5 Partnership Agreement).

[33] *See* RR Vol. 3 at pg. 60.

[34] *See* RR Vol. 3 at pgs. 41-42, 49.

[35] *See* RR Vol. 7, PX-23 (C-5 Partnership Agreement at § 5.5). *See* RR Vol. 3 at pgs. 41-42, 49. Pursuant to that express grant, Defendant Flatmax entered into a Letter of Intent Agreement to purchase the Petrodome Key Largo Prospect. *See* RR Vol. 6, PX-14 (Draft LOI addressed to Flatmax).

[36] *See* RR Vol 2 at pg. 50. There is no similar Section 7 provision in Baker's employment agreement with Everest, nor is there any restriction on Baker's work after leaving Everest. *See* RR Vol. 4 at pg. 43. Other Everest employees, including Clark, did not have the same agreement as Desenberg. *See id.* at pg. 81.

Set forth in the Attached Exhibit A is a schedule of seismic and associated data rights currently owned or controlled by Flatmax and its affiliates (the "Retained Seismic"). Attached as Exhibit B is a map showing the area covered by the Retained Seismic (the "Covered Area"). Unless otherwise subsequently agreed, and notwithstanding Employee's confidentiality obligations set forth above, *Flatmax and its affiliates will retain all ownership of the Retained Seismic and all opportunity rights to pursue prospects within the Covered Area before and after termination of the Terms of the Employment, subject to the following*:

(2) Otherwise, during the Term of Employment, Desenberg, Flatmax and their affiliates agree to pursue prospects within the Covered Area jointly with the Company on a mutually agreed basis, and to pursue prospects outside the Covered Area exclusively for the account of the Company and/or C-5. (emphasis added)

Subsection 2 did not create a worldwide prohibition to compete as Plaintiffs claim, but rather only restricted the ability of Defendant Flatmax and its affiliates to pursue opportunity rights within the Covered Areas (which consists of Desenberg's data within three counties of Texas) and outside of the Covered Areas (which consists of the remaining area of the three counties in Texas).[37] This was discussed as part of the negotiations several times and was the understanding of the parties.[38] In other words, inside the three counties within the Covered Area, Desenberg earned a mutually agreed special interest amount, whereas outside the Covered Area, Desenberg did not earn any additional mutually agreed to interest.[39]

---

[37] *See* RR Vol 2 at pg. 50.

[38] *See id.*

[39] See *See* RR Vol. 6, PX-1 (Desenberg Employment Agreement) at pg. 6. Mutually agreed basis was not defined in the Agreement but was agreed by all parties on many occasions to be

Any ambiguity in the agreement was due the fact that Plaintiffs failed to attach the referenced exhibits to the Agreement.[40]

The Key Largo Prospect which is located in Alabama, however, has nothing to do with Mr. Desenberg's data (which is limited to three counties in South Texas) and therefore was beyond the purview of the restriction set forth in Subsection (2).[41]

**F.** **Plaintiffs Treat Defendants Desenberg, Baker, and Investors Poorly; Desenberg and Baker Each Independently Decide to Leave Everest Before Hearing About the Alabama Prospect.**

Desenberg and Baker each made an independent decision to leave Everest, and did not solicit each other to leave.[42] Moreover, both made the decision to leave months before they ever heard about the Alabama Prospect.[43]

In June 2014, Baker had made the decision to leave Everest because Everest lacked the ability to evolve and meet the current challenges in the oil and gas industry.[44]

---

compensation to Desenberg of either a 1 % overriding royalty interest or a 2 % carried working interest to sales on any prospect drilled on the Flatmax 3-D Data Sets. *See* CR at pg. 1139.

[40] No exhibits were attached to the original Desenberg Employment Agreement. *See* RR Vol. 2 at pg. 34. Rather, Desenberg's employment agreement with Everest lacks a list of the Flatmax 3-D Shoots and it lacked the map identifying the covered and non-covered areas. *See id.*

[41] *See* RR Vol. 3 at pg. 13.

[42] *See* RR Vol. 3 at pg. 50.

[43] *See* RR Vol. 3 at pgs. 50-51.

[44] *See* RR Vol. 4 at pgs. 41-43.

7

Desenberg decided to finally leave Everest at the end of July 2014 specifically after Crain engaged in a bullying tirade after attempting to steal Desenberg's interest in producing properties.[45]

In addition to Desenberg and Baker, Everest treated investors and other C-5 partners exceptionally poorly.[46] Reports to investors and partners were irregular, horrendous and incomplete.[47] C-5 was also poorly managed and in financial difficulties. Despite initially raising millions of dollars including Desenberg's $250,000, C-5 partners inexplicably had requests for cash calls beginning in or around October 2013, only one year after the initial funding of C-5.[48]

### G. Defendants Desenberg and Baker Do Not Hear About the Potential Alabama Prospect Until the Last Few Weeks of Their Employment With Everest; and Do Not Use Any Everest Resources in Exploring the Possibility of The Alabama Prospect.

Desenberg first learned about the potential for the Alabama Prospect on or about August 6, 2014, less than a month before his resignation.[49] Desenberg was contacted by a friend who invited him to look at some information concerning a prospect in Alabama.[50] It was not clear that Defendants could even purchase the

---

[45] *See* RR Vol. 3 at pgs. 48-49. Desenberg was also concerned about the state of C-5 and investors he had introduced to Plaintiffs. *See id.*

[46] *See* RR Vol. 3 at pgs. 44-45.

[47] *See id.*

[48] *See* RR Vol 2 at pg. 56; RR Vol. 3 at pgs. 48-49.

[49] *See* RR Vol 2 at pg. 64; Vol. 3 at pgs. 50-51.

[50] *See* RR Vol. 2 at pgs. 64-66.

prospect at that time as another party was involved in negotiations with Petrodome and had already been evaluating the prospect.[51] Somewhere around August 15, 2014, Baker, Rich, and Desenberg sat down and began looking at the possibility of participating in the prospect. Defendant Rich was the primary individual negotiating the deal, with Defendant Desenberg only participating peripherally.[52] On August 29, 2014, the last business day before Defendants Desenberg and Baker's resignations, a letter of intent was signed between Flatmax and Petrodome.[53] At no time prior to August 29, 2014, did any Defendant have any contractual right of any kind to the Alabama Prospect.[54]

The Alabama Prospect was a highly risky investment, and required a tight closing with a lot of money needing to be raised quickly.[55] A $500,000 non-refundable deposit was requested and paid by Desenberg and Rich's company on the last Friday of August 2014.[56] Defendants barely had enough money to fund deal. In fact, Desenberg had to borrow some of the $450,000 he personally funded for the Petrodome stock purchase.[57]

---

[51] *See* RR Vol. 3 at pg. 51.

[52] *See* RR Vol. 2 at pg. 78.

[53] *See* RR Vol. 3 at pgs. 52-53.

[54] *See id.*

[55] *See* RR Vol. 2 at pgs. 70, 103-104.

[56] *See* RR Vol. 2 at pgs. 79, 103-104; Vol. 3 at pg. 57.

[57] *See* RR Vol. 2 at pg. 100.

Desenberg and Baker resigned from Everest the following Tuesday, on September 3, 2014.[58] The Key Largo acquisition closed on October 1, 2014, approximately one month later.[59] The total acquisition price for the 40% working interest was $7.5 million,[60] which was funded entirely by Defendants' friends, family, and through a personal loan to Desenberg.[61] These investors paid $9 million dollars for a 35% interest in the Prospect.[62]

Defendants retained a 4% working interest, with a 1% working interest going to Don Snow, who had served as a consultant on the project.[63] The difference in what was raised above the acquisition price was earmarked to go back in the ground through such things as leasing, drilling, and seismic.[64]

The investors signed participation agreements with Big Reef Energy, LLC, which owns 100% of the stock of Alabama Petrodome II, LLC[65] Petrodome Alabama II, LLC, in turn, owns the rights to the assignment of a 40% working

---

[58] *See* RR Vol. 4 at pg. 33.

[59] *See* RR Vol. 2 at pg. 88.

[60] *See id.*

[61] *See* RR Vol. 2 at pgs. 89, 95-96, 98-99, 100.

[62] *See id.*

[63] *See* RR Vol. 2 at pgs. 68, 97.

[64] *See* RR Vol. 2 at pgs. 97-98. Defendants are currently incurring various expenses, such as office space, seismic, and leasing that are necessary in order to keep development of the Project going. *See* RR Vol. 3 at pg. 33.

[65] *See* RR Vol. 3 at pgs. 7-8, 94-97.

interest in the Alabama Prospect.[66] Prior to the temporary injunction, Petrodome Alabama II, LLC was slated to be merged into Big Reef Energy, LLC.[67] That merger, however, has currently been enjoined by the Court.

From August 6, 2014—the date Desenberg first heard about the potential opportunity to the time they resigned, Defendants did not use Everest resources in pursing the Key Largo Prospect.[68] During that time, Desenberg and Baker continued to work full time for Everest and did not use any company resources in connection with the Key Largo Prospect, except perhaps for an occasional email or a call on a personal cel phone.[69]

At no time during their employment with Everest did Desenberg or Baker engaged in any activity that would have materially interfered with the performance of their obligations to the Everest.[70] They worked on the Petrodome Project typically at nights and on the weekends.[71] Nor did Desenberg or Baker take any confidential information or trade secrets of any kind from Everest.[72]

Desenberg and Baker's departure from Everest was otherwise cordial. Indeed, after Desenberg and Baker announced that they were leaving Everest,

[66] *See id.*
[67] *See* RR Vol. 3 at pgs. 98-99.
[68] *See* RR Vol. 3 at pgs. 51, 61; Vol. 4 at pg. 39.
[69] *See* RR Vol. 3 at pgs. 51, 60-61; Vol. 4 at pgs. 38-39.
[70] *See id.*
[71] *See id.*
[72] *See id.*

Crain came into Desenberg's office.[73] Crain stated that he would love to continue working with Desenberg and Baker, and offered to do land work on the side for them.[74]

**H.** **Defendants Facilitate and Purchase a Right of Assignment to a 40% Working Interest in the Alabama Prospect on Behalf of Investors Who Were Bona Fide Purchasers And Who Had No Interest in Doing Business With Everest.**

Neither C-5 nor Everest had the financial resources to acquire the Alabama Prospect. In fact, Everest didn't have the resources to acquire any prospect, let alone the $7.5 million dollar 40% working interest in the Alabama Prospect. Prior to the Alabama Prospect, Defendants Desenberg and Baker had presented two potential prospects to Everest, both of which Everest declined to fund.[75] Indeed, Everest didn't even have money to keep operations going. By October 2013, Everest's Crain began stressing the need for cash calls in order to sustain continued operations.[76] By August 2014, the very month that the Petrodome letter of intent was signed, Everest's funding had all but dried up. Specifically, on August 27, 2014—two days before the Alabama letter of intent was signed—Everest held a partner's meeting in which Crain and Ron Polansky, C-5 Chief Financial Offer,

---

[73] *See* RR Vol. 3 at pg. 53.

[74] *See id.*

[75] *See* RR Vol. 3 at pgs. 57-58.

[76] *See* RR Vol. 3 at pg. 48.

begged Clark to use his sources and raise exploration capital for C-5.[77] Clark absolutely refused to raise any exploration capital for C-5, at which point Everest were effectively defunct.[78]

Nor was there any reason to believe that Everest could sell the Alabama Prospect to Defendants' investors. All of the investors in the Key Largo Prospect had a relationship with at least one of the Defendants prior to Defendants working for Everest, and simply were not interested in investing with Everest.[79] Nor was Desenberg who took out a personal loan interest in order to complete the Petrodome acquisition interested in further investments with Everest.[80]

Apart from not having the financial wherewithal to complete the $7.5 million acquisition, Everest also did not have an interest in investing in or otherwise acquiring a 40% working interest in the Alabama Prospect. First, the Alabama Prospect was a non-operator deal, whereas Everest was typically the operator in a deal.[81] Being the operator is critical to using other people's money which was Everest business philosophy.[82] Second, the Alabama Prospect required

---

[77] *See* RR Vol. 3 at pg. 58.

[78] *See id.* *See also* CR 1486-87 (showing cash balance of C-5 Oil & Gas at end of August 2014 of only $32,467.53, with total assets of less than $1.5 million); CR 1155, 1384 (now showing total assets at end of August 2014 at only $767,238.49).

[79] *See* RR Vol. 3 at pgs. 56, 58-60.

[80] *See* RR Vol. 2 at pg. 100.

[81] *See* RR Vol. 3 at pgs. 53-56; Vol. 4 at pg. 42.

[82] *See id.*

big, non-refundable cash up-front, whereas Everest would not fund anything up-front that was not refundable.[83]  Third, the Alabama Prospect required an absolute immediate decision, and Everest was unable to make such decisions in short time frames.[84]  Lastly, Everest would not have been interested in the deal because the Alabama Prospect had significant business risk and Everest was extremely business risk adverse.[85]

Tellingly, Plaintiffs were well aware of the Petrodome offering by Defendants no later than September 4, 2014—the day after Desenberg and Baker resigned from Everest.[86]  Despite being keenly aware of the Alabama Prospect and having Alabama Prospect offering documents in their possession, Plaintiffs failed to contact Defendants to inquire further and otherwise showed no interest in pursuing the Alabama Prospect—that is, prior to other investors taking on all the risk and putting up all the money.   It was not until a month and a half later after first being informed of the offering, that Plaintiffs, without any warning or prior notice, filed suit.[87]

---

[83] *See id.*

[84] *See id.*

[85] *See id.*

[86] *See* RR Vol. 4 at pg. 89.

[87] *See* RR Vol. 4 at pg. 92.

**I.** **Contrary to Plaintiffs' Claim, Defendants Did Not Take Any Confidential Investor List or Improperly Download A Google Earth File**

Plaintiffs' claim that Defendants took confidential customer lists and improperly downloaded a Google Earth file is unsupported. The customer list that Desenberg downloaded on September 4, 2014 was simply Desenberg's personal contact list from his Outlook.[88] Desenberg had been compiling this list of contacts for many years, well before he started working at Everest.[89] These contacts included, for example, Desenberg's upholster, his mechanic, his acupuncturist, family, and good friends.[90] Indeed, Clark—Everest's CEO—admitted under cross examination that the list really wasn't confidential.[91] Defendant Baker did download a Google Earth file, but only after obtaining permission to do so.[92] Defendant Baker had been accumulating well coordinates and locations files from all the places he had worked over the years, including for example, Tunisia, Louisiana, and Texas, and had been storing such information on his Google Earth file.[93] So as not to lose his information, Defendant Baker exported a copy of this

---

[88] *See* RR Vol. 2 at pg. 61.

[89] *See id.*

[90] *See id.*

[91] *See* RR Vol. 4 at pgs. 78-79.

[92] *See* RR Vol. 4 at pgs. 39-41. Defendants were invited back to the office a few days after their resignation. *See* RR Vol. 4 at pg. 35.

[93] *See* RR Vol. 4 at pgs. 35-36, 39-41.

information into an export file.[94]  While the file did some cursory information regarding Everest, such information was not proprietary and was in fact publicly available.[95]

**J.      Defendants Have Received a Drilling Proposal And Are Required to Act in Order to Develop And Preserve the Alabama Prospect.**

On Friday, November 14, 2014, just a few days before the temporary injunction hearings, Defendants received a well proposal from Renpetco—the operator of the Alabama Prospect.[96]  Renpetco requested that the election be returned within 10 days along with a check for 51.6% of the costs of the first well, which represents the 40% working interest belonging to Defendants and their investors, as well as a carry for other working interests.[97]

Renpetco's well proposal triggered deadlines requiring Defendants to act expeditiously.  According to the Participating Agreement, failure to participate in a proposed well and prospect within ten days of a well proposal will result in a forfeiture of participation rights in that prospect.[98]  Moreover, consent to participate in a proposed obligatory well, followed by a failure to pay for the well

---

[94] *See id.*

[95] *See* RR Vol. 4 at pgs. 35-36, 39-41.  Mr. Baker did delete some seismic data off of Everest's computer, but only did so based on his understanding that such data contractually belonged to Flatmax    *See* RR Vol. 4 at pgs. 44-45.  There is presently a dispute over ownership of this seismic data.  Defendants are amenable to depositing with the court a copy of the disputed data until a resolution of ownership of the data.  Moreover, Geotrace has a copy of this disputed data.

[96] *See* RR Vol. 2 at pgs. 130-131; Vol. 3 at pg. 20; RR Vol. 7, DX-1 Renpetco Well Proposal).

[97] *See* RR Vol. 7, DX-1 (Renpetco Well Proposal).

[98] See RR Vol. 7, DX-5 (Renpetco Participation Agreement, Article 3 at pg. 8).

in accordance with the terms of the agreement, will result in a loss of all rights and obligations under the Participation Agreement.[99]

In order to avoid forfeiture, Defendants have since elected to participate in the drilling of the first well. However, the costs associated with drilling the first well and subsequent wells remain outstanding. Paragraph 3(a) of Exhibit "C" of the JOA, and Paragraph I of Article XV of the JOA, as found of page 17 of the JOA, in turn, both require payment with 15 days after billing receipt.[100] That deadline has now come and past.[101] Defendants are arguably now in default of the Participation Agreement and other agreements.[102]

Unless Defendants are able to raise capital to fund the well proposal as well as future wells, all parties' ability to participate in the Prospect may be lost. The projected cost of the first completed well is over $2.45 million.[103] The only way that Defendants can pay for the well proposal as well as subsequent proposals is through cash call to investors. However, investors must be assured of clear title prior to investing additional capital towards the Alabama Prospect.

---

[99] *See* RR Vol. 7, DX-5 (Article 3 provides in relevant part that "[i]f Renpetco or its successor does not receive a written electron from any participant, within ten (10) business days of receipt by the non-responding Participant of the Prospect JOA, the non-responding Participant shall be deemed to have not participated in the Prospect JOA."); RR Vol. 4 at pgs. 9-16, 22-24.

[100] *See* RR Vol. 7, DX-5.

[101] Desenberg testified that even if the TRO were dissolved it would be different to come up with the required $700,000 in a week. *See* RR Vol. 3 at pg. 23.

[102] *See* RR Vol. 7, DX-5.

[103] *See* RR Vol. 7, DX-1. Defendants are responsible for funding 51.6% of the total well cost.

## II. SUMMARY OF THE ARGUMENT

Appellants are appealing subsections (a)-(f) of Paragraph 35 of the Temporary Injunction Order, as such sections were improperly granted pursuant to Tex. R. Civ. P. 681 and 683. Subsections (a) and (b) which deal with Defendants' use of certain data should be declared void by the Court because such sections lack requisite specificity, and are overly broad in restraining lawful conduct. Similarly, subsection (c) which relates to restraining Defendants from communicating with third-party Geotrace Technologies regarding Plaintiffs should be declared void by the Court because it lacks requisite specificity, and is overly broad in restraining lawful conduct.

Subsection (d) which enjoining Defendants from undertaking various actions with respect to the Alabama Prospect, including performing a necessary merger and transferring working interests to bona fide purchasers should be declared void by the Court because it improperly affects rights of parties not joined to the lawsuit or injunction hearing, grants relief beyond that which was requested by Appellees' in the petition, grants relief where there is no irreparable harm, and is overly broad in restraining lawful activity. Similarly, subsection (e) which enjoins Defendants from undertaking various actions with respect to unidentified prospects should be declared void by the Court because it lacks requisite specificity, is overly broad in restraining lawful activity, and creates what is otherwise an impermissible non-

compete provision. Lastly, Subsection (f) which enjoins Defendants from transferring funds from the Alabama Prospect as well as other unidentified Prospects, should be declared void by the Court because it lacks requisite specificity, is overly broad in restraining lawful activity, and similar to Subsection (e) creates an impermissible non-compete provision.

Appellants are also challenging subsection (d), which relates to the Alabama Prospect, on the basis that Appellees failed to prove probable, imminent, and irreparable injury; on the basis that the Court failed to consider the equities in the case; and on the basis that the temporary injunction fails to preserve the status quo.

Appellants are also challenging the temporary injunction order on the basis that the trial court abused its discretion in granting a low bond of $10,000 under the circumstances, whereas Defendants and bona fide purchasers stand to potentially lose millions of dollars in damage due to the temporary injunction.

## III. ARGUMENT AND AUTHORITIES

### A. <u>Tex. R. Civ. P 681 and 683</u>.

A trial court abuses it discretion by violating the requirements of Rule 683. A temporary injunction that violates Rule 683 is subject to being declared void and dissolved.[104] The purpose of Rule 683 is to adequately inform a party of what he is

---

[104] *See* Tex. R. Civ. P. 683; *Qwest Commc'ns Corp. v. AT&T Corp.,* 24 S.W.3d 334, 337 (Tex. 2000) (requirements of Rule 683 are mandatory and must be strictly followed).

enjoined from doing and the reasons why he is enjoined.[105] Under Rule 683, a valid order for a temporary injunction must: (1) state the reasons for the injunction's issuance by defining the injury and describing why it is irreparable; (2) define the acts sought to be enjoined in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him; and (3) set the cause for trial on the merits and fix the amount of the bond.[106]

Furthermore, an injunction decree must be as definite, clear and precise as possible and, when practicable, it should inform the person enjoined of the acts he is restrained from doing, without calling for inferences or conclusions about which persons might well differ and without leaving anything for further hearing.[107] The decree must describe in reasonable detail and not by reference to the complaint or other documents, the acts to the restrained.[108] The trial court must also state in its order a "nexus" between the laundry list of probable injuries and finding that such

---

[105] *El Tacaso, Inc.*, 356 S.W.3d 740, 744 (Tex. App.—Dallas 2011, no pet.).

[106] *See* Tex. R. Civ. P. 683; *Interfirst Bank San Felipe, N.A. v. Paz Constr. Co.*, 715 S.W.2d 640, 641 (Tex. 1986); *Ex parte Slavin,* 412 S.W.2d 43, 44 (Tex. 1967); *Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d 488, 495 (Tex. App.—Dallas 2012, no pet.).

[107] *See San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 291 S.W.2d 697, 702 (Tex. 1956).

[108] *See* Tex. R. Civ. P. 683; *Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d at 495.

probable injuries are irreparable.[109] "[A] trial court abuses its discretion by entering an 'overly-broad' injunction which grants 'more relief' than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights."[110] Moreover, injunctions must be narrowly drawn and precise.[111] Where the injunctive relief granted exceeds the relief requested by the applicant in the petition, the trial court exceeds its jurisdiction.[112]

A temporary injunction is also void to the extent it runs afoul of the requirements of Rule 681. Tex. R. Civ. P. 681 succinctly provides that "no temporary injunction shall issue without notice to an adverse party." Notice to adverse party requires an opportunity to be heard as well the opportunity to present

---

[109] *Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d 488, 497 (Tex. App.—Dallas 2012, no pet.).

[110] *See, e.g.*, *Holubec v. Brandenberger*, 111 S.W.3d 32, 39-40 (Tex. 2003).

[111] *See id.*

[112] *See Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 718 (Tex. App.—Corpus Christi 2001, no pet.) ("[W]here the injunctive relief granted exceeds the relief requested by the application in the petition, the trial court exceeds its jurisdiction."). The request, both as to type of relief and extent, must be specific. *See Fairfield v. Stonehenge Ass'n,* 678 S.W.2d 608, 610-11 (Tex. App.—Houston [14th Dist.] 1984, no writ). The original petition which was the live pleading at the start of the temporary injunction hearing did not contain or request the relief that Plaintiffs obtained from the court. While Plaintiffs did file a separate application for temporary injunction, the requested relief was not stated or requested in the petition. Arguably, the court was without authority to enter the relief requested by Plaintiffs. Plaintiffs did not file an amended petition containing requested relief for the temporary injunction until November 21, 2014— during the middle of the temporary injunction hearing. Plaintiffs' amended petition and joinder of C-5 as Plaintiff was not properly before the Court. *See* Tex. R. Civ. P. 63; *In re Fluor Enterprises, Inc.*, 2011 WL 2463004, *4 (Tex. App.—Corpus Christi 2011, orig. proceeding) (holding that amended petitions filed on the day of hearing for change of venue were untimely pursuant to Tex. R. Civ. P. 63 and therefore they "were not before the trial court for its consideration."). In any event, the amended petition sought relief that was narrower than the relief granted by the trial court.

evidence above and beyond the mere opportunity to cross-examine the party's witnesses.[113]

## 1. The Injunction Is Void As It Violates Tex. R. Civ. P. 681 and 683.

Several subsections of the Temporary Injunction which enjoin Defendants and other non-parties from undertaking certain actions run afoul of these mandatory requirements of Rules 681 and 683.

### (1) *Subsection (a) lacks requisite specificity and is overly broad.*

Under Subsection (a), Defendants David Desenberg, Flatmax Energy, L.P., Flatmax Oil & Gas, L.L.C., Keith H. Baker, Reagan Rich, and Big Reef Energy, LLC (collectively "Defendants"), including their officers, agents, servants, employees, and attorneys, and all persons, corporations and entities in active concert or participation with them, from in any manner whatsoever are restrained from:

(a) modifying, deleting, transferring, altering, viewing, showing, loading, copying or otherwise using in any manner 3-D seismic data and 3-D projects and associated data, information and derivatives thereof (including, without limitation, raw data, processed data, culture used with the data, interpretations of data, maps, lines, and horizons) that was taken or deleted from Everest Resource Company offices,

---

[113] *See, e.g., Elliot v. Lewis*, 792 S.W.2d 853, 855 (Tex. App. Dallas 1990, no writ), *PILF Invs. v. Arlitt*, 940 S.W.2d 255, 259-60 (Tex. App.—San Antonio 1997, no writ). Not only were Defendants ambushed with the joinder of C-5 during the middle of the hearing, but the amount of time allotted to Plaintiffs as opposed to Defendants was grossly lopsided and lacking in fundamental fairness. *See, e.g.*, RR Vol. 4 at pg. 57.

computers, files or file servers, or that was subject to Everest Resource Company's right of ownership or control pursuant to the Desenberg Employment Agreement, including any such data that Desenberg or Flatmax Energy, L.P. obtained from Geotrace Technologies or other vendors used by Everest Resource Company; however, the Defendants are not barred from using the original, raw or processed data, that Flatmax Energy contributed to Everest Resource Company in such original form;

This subsection lacks the requisite specificity under Tex. R. Civ. P. 683 in that it fails to define the acts sought to be enjoined in clear, specific, and unambiguous terms so that a person will readily know exactly what duties or obligations are imposed. Furthermore, the subsection improperly requires reference to other documents. Specifically, the subsection seeks to enjoin Defendants from *"using in any manner"* "3-D seismic data and 3-D products and *associated data, information and derivatives therefore (including, without limitation, raw data, processed data, cultured used with the data, interpretations of data, maps, lines, and horizons)…that was subject to the Everest Resource Company's right of ownership or control pursuant to the Desenberg Employment Agreement."*[114]

---

[114] *See Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d at 495 ("[R]ule of civil procedure 683 requires every order granting a temporary injunction to state the reasons for its issuances, be specific in terms, and describe in reasonable detail and not by reference to the complaint or other documents, the acts sought to be restrained.").

The subsection is also overly broad in that restrains lawful activity and is not narrowly tailored. [115] For example, the subsection could be read to prevent Defendants from sharing this information with their attorneys and/or other consultants in this litigation, or in otherwise reviewing this information in order to defend against Plaintiffs' allegations.

### (2) Subsection (b) lacks requisite specificity, is overly broad, and fails to show irreparable harm.

Under Subsection (b), Defendants and others are restrained from:

(b)  modifying, deleting, transferring, altering, viewing, showing, loading, copying or otherwise using in any manner Everest Resource Company confidential business information and derivatives thereof (including, without limitation, customer lists, vendor lists, investor lists, business forms, well data, logs, maps, geologic information and Google Earth files) that were taken or copied from Everest Resource Company offices, computers, files or file servers, or that was subject to Everest Resource Company's ownership or control pursuant to the Desenberg and Baker Employment Agreements;

This subsection also lacks the requisite specificity under Tex. R. Civ. P. 683 in that it fails to define the acts sought to be enjoined in clear, specific and unambiguous terms so that a person will readily know exactly what duties or obligations are imposed. Furthermore, the subsection improperly requires reference to other documents. Specifically, the subsection seeks to enjoin Defendants from *"using in any manner" "Everest Resource Company confidential business information and derivatives thereof (including, without limitation,*

---

[115] *See, e.g., Holubec v. Brandenberger*, 111 S.W.3d 32, 39-40 (Tex. 2003)

*customer lists, vendor lists, investor lists, business forms, well data, logs, maps, geologic information and Google Earth files)....that was subject to Everest Resource Company's ownership or control pursuant to the Desenberg and Baker Employment Agreements.*"[116]

The subsection is also overly broad in that restrains lawful activity and is not narrowly tailored. [117] For example, the subsection could be read to prevent Defendants from sharing this information with the attorneys or other consultants in this litigation.

> *(3)    Subsection (c) lacks requisite specificity, and is overly broad.*

Under Subsection (c), Defendants and others are restrained from:

(c)    contacting Geotrace Technologies, whether by email, telephone or otherwise, concerning Everest Resource Company's seismic data or otherwise interfering in the contractual relationship between Everest Resource Company and Geotrace Technologies;

This subsection also lacks the requisite specificity under Tex. R. Civ. P. 683 in that it fails to define the acts sought to be enjoined in clear, specific and unambiguous terms so that a person will readily know exactly what duties or obligations are imposed. Furthermore, the subsection improperly requires

---

[116] *See Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d at 495 ("[R]ule of civil procedure 683 requires every order granting a temporary injunction to state the reasons for its issuances, be specific in terms, and describe in reasonable detail and not by reference to the complaint or other documents, the acts sought to be restrained.").

[117] *Holubec v. Brandenberger*, 111 S.W.3d 32, 39-40 (Tex. 2003).

reference to other documents. Specifically, the subsection seeks to enjoin Defendants from contacting *"Geotrace….concerning Everest Resource Company's seismic data"* or *"otherwise interfering in the contractual relationship between Everest Resource Company and Geotrace Technologies."*[118]

The subsection also is overly broad in that restrains lawful activity and is not narrowly tailored.[119] For example, the subsection could be read to prevent Defendants' attorneys from serving third-party discovery on Geotrace. The subsection could also be read to prevent Defendants from communicating with Geotrace in order to defend the allegations made against Defendants in this case or in order to protect for example, any data belonging to Defendants that has not been reprocessed yet.[120] This subsection is also objectionable as the temporary injunction order and the evidence fail to show why Plaintiffs would suffer imminent, immediate, and irreparable harm unless Appellee's were enjoined from these actions.[121]

---

[118] *See Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d at 495 ("[R]ule of civil procedure 683 requires every order granting a temporary injunction to state the reasons for its issuances, be specific in terms, and describe in reasonable detail and not by reference to the complaint or other documents, the acts sought to be restrained."). "Everest Resource Company's seismic data" is undefined, and the parties otherwise dispute ownership of various seismic data.

[119] *See Holubec v. Brandenberger*, 111 S.W.3d 32, 39-40 (Tex. 2003).

[120] The temporary injunction is clear for example that Defendants have a right to access and use of raw, original data, which is currently in the hands of GeoTrace. *See* CR 579.

[121] The evidence actually shows no probable, imminent, or irreparable harm. Plaintiffs' request for temporary injunction is based on a series of emails involving the parties and Geotrace in early

*(4)* *Subsection (d) lacks requisite specificity, is overly broad,*
*and grants relief not specifically requested.*

Under Subsection (d), Defendants and others are restrained from:

(d)    further marketing, selling, offering for sale, transferring, assigning, encumbering, burdening, or contracting to assign or sell any interest in the Key Largo Prospect, including without limitation, transferring ownership of Key Largo Prospect out of Petrodome Alabama II, LLC, merging Petrodome Alabama II, LLC into Big Reef Energy L.L.C., or taking like measures that would have the effect of transferring ownership of the property, or further assigning or promising to assign any mineral leasehold interest in the Key Largo Prospect; however, to the extent contractually required to change the name of Petrodome Alabama II, LLC, the defendants shall be permitted to do, so long as the name change does not have the effect of transferring title to the Key Largo Prospect into any named defendant that has already contracted to sell any interest in the Key Largo Prospect;

This subsection is overbroad and void pursuant to R. Civ. P. 681 and 683.

First, this section improperly purports the affects the rights and interest of numerous non-parties who were never given notice of the temporary injunction as well as an opportunity to be heard. [122] These numerous non-parties include Petrodome Alabama II, LLC, third-party investors, Renpetco (the operator of the

---

September 2014—more than two before the temporary injunction hearing. Crain and Clark were carbon copied on the e-mails shortly after Desenberg and Baker left in early September 2014, in which Desenberg asserted that Flatmax owned the data that was in Geotrace's possession. *See* RR Vol. 6, PX-9. Neither Crain or Clark voiced any objection or otherwise challenged Desenberg's statement as inaccurate in the email exchanges. Nor did Crain or Clark ever subsequently challenge Flatmax's ownership of the data until filing suit. *See* RR Vol. 3 at pgs. 39-40. There is no reason to believe that Defendants must be enjoined to prevent probably, imminent, and irreparable harm.

[122] *See* RR Vol. 5 at pg. 18.

Prospect), and other working-party groups.[123] The contractual rights of obligations of these parties are directly and negatively affected by the Court's injunction.[124] None of these companies or individuals is a party to the action or temporary injunction hearing and thus the temporary injunction is therefore overbroad and void. *See* Tex. R. Civ. P. 681 ("no temporary injunction shall be issued without notice to the adverse party.); *Down Time-South Texas, LLC*, 2014 WL 1464320, *6 (Tex. App.—Corpus Christi 2014, no pet.) (not designated for publication) (affirming trial court's decision to deny temporary injunction where petitioner failed to designate all necessary parties); *PILF Invs. v. Arlitt*, 940 S.W.2d 255, 259-60 (Tex. App.—San Antonio 1997, no writ) (notice on a motion for injunctive relief is inadequate to the extent a non-movant party, who is ultimately enjoined, is not served with notice of the hearing). *See also Ladner v. Reliance Corp.*, 293 S.W. 2d 758, 764-65 (Tex. 1965) (A defendant whose rights will be directly affected by the writ qualifies as an indispensable party.).[125] The subsection is further overbroad and void under Rule 683, because it could potentially be read to enjoin Appellants from lawfully acquiring either on behalf of themselves or

---

[123] *See* CR-580, Temporary Injunction Order at pg. 12 ("transferring ownership of the Key Largo Prospect out of Petrodome Alabama II, LLC, merging Petrodome Alabama II, LLC into Big Reef Energy, L.L.C.").

[124] *See* RR Vol. 7, DX-5-9.

[125] *See also McCharen v. Bailey,* 87 S.W.2d 284, 285 (Tex. App.—Eastland 1935, no writ) (citations omitted) ("To a proceeding in equity it is necessary to join as parties all persons whose interests are directly or indirectly involved in the controversy.").

investors the remaining 60% working interest in the Alabama Prospect, or some portion thereof.

These subsection is further overbroad and void under Rule 683 because it grants Appellees' relief that was not requested in their petition, namely this subsection enjoins the previously contemplated merger of Petrodome Alabama II, LLC into Big Reef. Neither Appellees' original petition or amended petition specifically request this relief.[126] A trial court abuses its discretion by entering an 'overly-broad' injunction which grants 'more relief' than a plaintiff is entitled to by enjoining a defendant from conducting lawful activities or from exercising legal rights.[127]

This subsection is void under Rule 683 because the order and evidence fails to explain why Appellees would be irreparably and imminently harmed if Appellants were not restrained for thereafter assigning out the remaining 35% working interest to the investors who paid millions of dollar for that assignment. Nor can Appellees. Plaintiffs have no claim to the investors' respective 35% working interest under either law or equity. Plaintiffs would never be entitled to recovery of the 35% interest, as the remedy for breach of fiduciary is fee forfeiture

---

[126] *See* CR 560 (Plaintiffs' Amended Petition at pg. 97).

[127] *See Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, (Tex. App.—Corpus Christi 2001, no pet.) ("[W]here the injunctive relief granted exceeds the relief requested by the application in the petition, the trial court exceeds its jurisdiction." The request, both as to type of relief and extent, must be specific. *See Fairfield v. Stonehenge Ass'n,* 678 S.W.2d 608, 610-11 (Tex. App.—Houston [14th Dist.] 1984, no writ).

and/or profit disgorgement.[128] Instead, the maximum forfeiture or disgorgement in this case is the 4% retained interest that Defendants retained during the process of selling the remaining working interest. *Cf. Alliance Royalties, LLC v. Boothe*, 313 S.W.3d 493, 496 (Tex. App.—Dallas 2010, no pet.) (noting that there must be some connection between the claims alleged and the acts sought to be enjoined and reversing a temporary injunction that granted relief to which party was not entitled to under the contract).[129]

Moreover, even if Plaintiffs were entitled to this 35% working interest—which they are not—the rights of the third-party investors who are bona fide purchasers would trump any equitable rights that Plaintiffs might have to the 35% working interest. Plaintiffs have not shown to the contrary. *See, e.g., Ratcliff v. Mahres,* 122 S.W.2d 718, 723 (Tex. Civ. App.—El Paso 1938, writ ref'd) (a bona fide purchaser will prevail over the holder of a prior equitable title). *See also Amason v. Woodman*, 498 S.W.2d 142, 143-44 (Tex. 1973) (dissolving permanent injunction after reciting rule that one who relies upon an equitable title as against a subsequent owner assumes the burden of showing that the latter is not an innocent

---

[128] *See, e.g., ERI Consulting Engineers, Inc. v. Swinnea,* 318 S.W.3d 867, 873 (Tex. 2010) ("courts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty.").

[129] Neither a party nor the court can "rewrite the parties' contract [or] add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 162 (Tex. 2003).

purchaser for value without notice).[130]   Appellees have hardly established immediate, imminent, and irreparable harm with respect to enjoining the transfer of the 35% working interest which properly belongs to the bona fide purchasers.   Nor have Appellees established irreparable, imminent, and irreparable harm with respect to the merger of Petrodome Alabama II, LLC into Big Reef.   For all these reasons subsection (e) must be declared void and be dissolved to the extent it fails to comply with Tex. R. Civ. P. 681 and 683.

> *(5)   Subsection (e) lacks requisite specificity, is overly broad, and grants relief not specifically requested.*

Under Subsection (e), Defendants and others are restrained from:

(e)   marketing, selling, offering for sale, transferring, assigning, encumbering, burdening, or contracting to assign or sell any interest in an oil, gas or mineral prospect (including without limitation, signing a participation agreement, entering into a joint operating agreement, or assigning or promising to assign any mineral leasehold interest therein) that was discovered, purchased, encountered or worked on by David Desenberg or Keith Baker during their employment at Everest Resource Company;

This subsection lacks the requisite specificity under Tex. R. Civ. P. 683 in that it fails to define the acts sought to be enjoined in clear, specific and

---

[130] One who buys property in good faith for valuable consideration, without actual or constructive knowledge of outstanding claims, is a bona fide purchaser and will prevail over the holder of a prior equitable title.  *Boswell v. Farm Home Sav Ass'n,* 894 S.W.2d 761, 766 (Tex. App.—Forth Worth 1994, writ denied); *NRG Exploration, Inc. v. Rauch,* 671 S.W.2d 649, 653 (Tex. App.—Austin 1984, writ ref'd n.r.e.); *Cf. Swanson v. Grassedonio*, 647 S.W.2d 716 (Tex. App.—Corpus Christi 1982, no writ) (affirming temporary injunction order enjoining foreclosure where purchaser was a bona fide purchaser).

unambiguous terms so that a person will readily know exactly what duties or obligations are imposed. For example, the subsection seeks to enjoin Defendants from numerous activities relating to *"any...prospect"* *"that was discovered, purchased, encountered or worked on by David Desenberg or Keith Baker during their employment at Everest Resources Company."*[131]

The subsection is also overly broad, in that it restrains lawful activity and is not narrowly tailored. Among other things, it prohibits Appellants from developing prospects that they were aware of prior to joining Everest, but nevertheless worked on while at Everest. For example, Defendant Desenberg brought to Everest the Albrecht prospect, which he leased before ever coming to Everest. He presented the prospect to Everest, but Everest never acted on it.[132] Similarly, Defendant Baker identified a prospect in Colorado County based on data he had prior to Everest, which Defendant Everest failed to act upon.[133]

More generally, the subsection is overly broad in that it restrains lawful competition. Under Texas law, former employees can use general knowledge,

---

[131] *See Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d at 495 ("[R]ule of civil procedure 683 requires every order granting a temporary injunction to state the reasons for its issuances, be specific in terms, and describe in reasonable detail and not by reference to the complaint or other documents, the acts sought to be restrained.").

[132] *See* RR Vol. 1 at pg. 135; Vol. 3 at pg. 11.

[133] *See* RR Vol. 1 at pgs. 136-137; Vol. 3 at pgs. 11-12.

skills, and experience acquired in the employment relationship, even when competing with their former employer.[134]

The subsection is also overbroad is not limited to confidential or trade secret information. In a case involving trade secrets or confidential information, Texas courts require that injunctions be narrowly tailored to address the improper use of confidential or proprietary information; temporary injunctions must not be framed so broadly as to prohibit the enjoyment of lawful rights.[135] As written, the trial court is improper creating and enforcing a non-compete when no such provision exists under Defendant Desenberg and Defendant Baker's employment agreement. *See Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Group Holdings, Inc.*, 374 S.W.3D at 502 (finding a similar prohibition void that was not specifically limited to use of confidential information*); Alliance Royalties, LLC v. Boothe*, 313 S.W.3d 493, 497 (Tex. App.—Dallas 2010, no pet.) (reversing temporary injunction where injunction granted relief that party was not entitled to under contract).

---

[134] *See American Derringer Corp. v. Bond*, 924 S.W.2d 773, 777 (Tex. App.—Waco 1996, no writ); *Auto Wax Co v. Byrd*, 599 S.W.2d 110, 112 (Tex. App.—Dallas 1980, no writ).

[135] *Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Group Holdings, Inc.*, 374 S.W.3d at 502.

The temporary injunction also fails to explain why this restraint is necessary in order to prevent probable, imminent, and irreparable harm to Appellees.[136] The two prospects that Defendant Desenberg and Barker worked on while at Everest were known to Defendants before joining Everest, and have already been rejected as opportunities by Everest. Plaintiffs have certainly not established probable, imminent, and irreparable harm with respect to subsection (e).[137]

> *(6)*     *Subsection (f) lacks requisite specificity, is overly broad, and grants relief not specifically requested.*

Under Subsection (f), Defendants and others are restrained from:

> (f)     transferring, spending, moving, or distributing any funds, cash, or cash equivalents that were obtained or derived from the purchase and/or sale of the Key Largo Prospect and/or Petrodome Alabama II, LLC, and/or any other oil, gas or mineral prospect that was discovered, purchased, encountered or worked on by David Desenberg or Keith Baker during their employment at Everest Resource Company, except that certain "Leach Prospect" specifically retained by Desenberg in the Desenberg Employment Agreement EXCEPT THAT Defendants are permitted to make the following expenditures—(1) normal and reasonable overhead operating expenses of Big Reef Energy LLC (which shall be submitted weekly to counsel for Plaintiffs for review); (2) the respective $150,000

---

[136] A court's order must explain the probable, imminent, and irreparable harm that will on behalf a party absent the actions being enjoined. *See Reliant Hosp. Partners, LLC v. Cornerstone Healthcare Group Holdings, Inc.*, 374 S.W.3d at 497. *See also Law Funder, LLC v. Law Offices of Doug Allison*, 2014 WL 895512, *6-8 (Tex. App.—Corpus Christi March 6, 2014, no pet.) (Not designated for publication) (order which did not state or explain the reasons why irreparable injury would result was void).

[137] Mere fear and apprehension of the possibility of injury is insufficient for injunctive relief. *See, e.g., Legacy Home Health Agency, Inc. v. Apex Primary Care, Inc.*, 2013 WL 5305238, *2 (Tex. App.—Corpus Christi 2013) (not designated for publication) (citing *Frey v. DeCordova Benda Estates Owners Ass'n,* 647 S.W.2d 246, 248 (Tex. 1983).

salaries payable in equal bi-weekly installments to Reagan Rich and Keith Baker; (iii) the drilling and completion expenses shown the in AFE and cash notice shown in Defendants' Exhibit 1 at the temporary injunction hearing; (iii) Petrodome Alabama II, LLC's proportionate share of seismic data costs and leasehold acquisition costs for the Key Largo Project area as may be invoiced or cash-called from time to time; (iv) attorneys' fees only upon further order of this court after submission of an application to the court with notice to Plaintiffs' counsel and an opportunity to be heard.

This subsection lacks the requisite specificity under Tex. R. Civ. P. 683 in that it fails to define the acts sought to be enjoined in clear, specific and unambiguous terms so that a person will readily know exactly what duties or obligations are imposed. For example, the subsection seeks to enjoin Defendants from numerous activities relating to *"any...prospect" "that was discovered, purchased, encountered or worked on by David Desenberg or Keith Baker during their employment at Everest Resources Company."*[138]

The subsection is also overly broad, in that it restrains lawful activity and is not narrowly tailored. Former employees can use general knowledge, skills, and experience acquired in the employment relationship, even when competing with their former employer.[139] Moreover, this section is overly broad, as this section

---

[138] *See Reliant Hospital Partners, LLC. v. Cornerstone Healthcare Group Holding, Inc.*, 374 S.W.3d at 495 (Tex. App.—Dallas 2012, no pet.) ("[R]ule of civil procedure 683 requires every order granting a temporary injunction to state the reasons for its issuances, be specific in terms, and describe in reasonable detail and not by reference to the complaint or other documents, the acts sought to be restrained.").

[139] *See American Derringer Corp. v. Bond*, 924 S.W.2d at 777; *Auto Wax Co v. Byrd*, 599 S.W.2d at 112.

prohibits Desenberg or Baker from pursuing prospects that they may have "worked on," but Appellees otherwise declined to pursue such as the Albrecht prospect.[140] The temporary injunction also fails to explain why this restraint is necessary in order to prevent immediate, imminent, and irreparable harm to Appellees.[141]

## 2. Trial Court Also Abused Its Discretion in Granting Injunctive Relief Relating to the Alabama Prospect As Appellees Failed To Meet Required Elements Necessary For Injunctive Relief.

A temporary injunction is an "extraordinary" remedy whose purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits.[142] To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.[143] In addition, when considering an application for injunctive relief, the trial court must weigh the respective conveniences and hardships of the parties and ultimately balance the equities. The court must consider injury that may result

---

[140] *See* RR Vol. 1 at pg. 135-137; Vol. 3 at pgs. 11-12.

[141] Similar to Subsection (e), this subsection in effect creates an impermissible non-compete restriction on Defendants' ability to do business, and therefore must be declared void.

[142] *Walling v. Metcalfe,* 863 S.W.2d 56, 57 (Tex. 1993).

[143] *See Walling,* 863 S.W.2d at 57; *Sun Oil Co. v. Whitaker,* 424 S.W.2d 216, 218 (Tex. 1968).

to the defendant and to the public if the injunction is issued, as well as the injury to the plaintiff if the relief is not granted.[144]

Subsection (d) must be dissolved as Plaintiffs failed to establish probable, imminent, and irreparable harm. Rather, the evidence showed that Plaintiffs would not suffer probable and irreparable harm, because Plaintiffs would not have been able to facilitate and acquire the working interest in the Alabama Prospect in the first place. As recounted in detail above, neither C-5 nor Everest had the financial resources to acquire the out-of-state Alabama Prospect; nor was Desenberg or Defendants' investors interested in further investment with Everest. Moreover, the evidence, as recounted above, further shows that apart from not having the financial wherewithal to complete the acquisition, Everest also did not have an interest in investing in or otherwise acquiring the Alabama Prospect. Indeed, the evidence also shows that despite being aware of the Alabama Prospect, Everest however, never contacted Defendants to inquire further and otherwise showed no interest in pursuing the Alabama Prospect, prior to filing suit.

Second, even if Plaintiffs were somehow able and interested in acquiring the Alabama Prospect, the only harm that Plaintiffs may ultimately have suffered is a

---

[144] *See Storey v. Central Hide & Rendering Co.*, 226 S.W.2d 615, 518-619 (Tex. 1950) (there should be a balancing of the equities in order to determine whether an injunction should have been issued); *Nueces County Drainage & Conservation Dist. v. Bevly*, 519 S.W.2d 938, 947-48 (Tex. Civ. App.—Corpus Christi 1975, ref. n.r.e.) (court should consider equities even though irreparable injury and inadequate remedy at law are shown).

37

loss of potential recovery of money damages relating to Defendants' 4% retained working interest or Defendants' profit, and not the 40% working interest that is presently enjoined.[145]

In any event, there is no immediate or imminent injury. Rights to the working interest do not completely vest until the completion of the first well which has yet to be drilled. Under the Participation Agreement, no participant is entitled to an assignment of a real property interest in an obligatory well until it has paid all costs and expenses associated with the well.[146] In sum, Plaintiffs have failed to make the required showing of probable, imminent, and irreparable harm in order for a temporary injunction to be issued with respect to actions enjoined in subsection (d).[147]

### 3. A Balancing of the Equities Necessitates That the Injunction be Dissolved With Respect to the Alabama Prospect.

The equities in this case strongly weigh against the issuance of a temporary injunction order with respect to the Alabama Prospect. Numerous innocent third-parties who have put up millions of dollars into the Prospect and are relying upon expeditious development of the Prospect are being irreparably harmed by the

---

[145] Plaintiffs have improperly obtained injunctive relief restraining the transfer of legal title of 35% of the working interest to third-party investors. As detailed above, Plaintiffs have no claim to the investors' respective working interest.

[146] *See* RR Vol. 7, DX-5 (Renpetco Participation Agreement).

[147] In addition to transfer of working interests to bona fide purchasers, Plaintiffs have also failed to establish immediate, imminent, and irreparable harm with respect to the merger of Petrodome Alabama II, LLC into Big Reef Energy LLC.

issuance of the temporary injunction. These include Renpetco, the prospect operator—who receives a carry on the first well—as well as innocent third-party investors who have put up millions of dollars in anticipation of being assigned their proportionate working interest. The temporary injunction has effectively frustrated their working interest—despite the fact that Plaintiffs, even if they prevailed on their claims against Defendants, would not be entitled to recovery of the respective working interest share of the investors.

In turn, the only two parties that are seeking a temporary injunction to block the continued development of the Prospect are cash-strapped entities who were never interested in the Prospect in the first place; who have yet to put a dime towards the Prospect; and who knew about the Prospect the day after Defendants Desenberg and Baker resigned, but elected to do nothing until Defendants had already sold a 35% working interest in the Alabama Prospect to innocent investors who are also bona fide purchasers.[148]

---

[148] The weight given to Plaintiffs' claims is further weakened by the fact that their claims rest largely on a vague and ambiguous contract. To support specific performance, a contract must have precise terms capable of enforcement. *Living Christ Church, Inc. v. Jones*, 734 S.W.2d 417, 420-21 (Tex. App.—Dallas 1987, writ denied); *Guzman v. Acuna*, 653 S.W.2d 315, 319 (Tex. App.—San Antonio 1983, writ dis'd (holding that agreement was not subject to specific performance because its essential terms were uncertain and ambiguous). Specific performance will be decreed only if the essential terms of the contracts are expressed with reasonable certainty." *Johnson v. Snell,* 504 S.W.2d 397, 398 (Tex. 1974); *Dev. Co., Inc. v. Gerfers,* 487 S.W.2d 219, 222 (Tex. Civ. App.—San Antonio 1972, writ ref'd n.r.e.) ("Specific performance will not be decreed unless the terms of the contract are so expressed that the court can determine with reasonable certainty what is the duty of each party and the conditions of performance.").

Ironically and tellingly, it is in Plaintiffs' interest to lift the temporary injunction with respect to subsection (d).  Specifically, the only way that any party including Plaintiffs is able to recover is if the Prospect is properly and fully developed.  However, Plaintiffs' temporary injunction order has effectively stalled the development of the Prospect, and threatens to destroy the entire prospect as well as the possibility of recovery by any party.  A weighing of the equities requires that the temporary injunction with respect to the Alabama Prospect be dissolved. *See Neuces County Drainage and Conversation Dist. v. Bevly*, 519 S.W. 2d at 949 (noting that interests of such a large number of people should not be subordinated to the private interests of a single landowner); *Hogue v. City of Bowie*, 209 S.W.2d 807, 809 (Tex. Civ. App.—Fort Worth 1948, writ ref'd n.r.e) ("It seems to be the settled law in this state that courts will deny equitable injunctive relief to the complaining party, if by balancing the equities between him and the general public more harm and inequities would follow to the many than to the complaining one, if such relief be granted….").[149]

---

[149] *See also Foxwood Homeowners Ass'n v. Ricles*, 673 S.W.2d 376, 379 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (complaining party must come to the court with clean hands and must have acted promptly to enforce its rights).  *See also NMTC Corp. v. Conarroe*, 99 S.W.3d 865, 869 (Tex. App.—Beaumont 2003, no pet.) (affirming trial court's denial of temporary injunction based on weighing of equities); *Hall v. Seal*, No. 04-09-00675-CV, 2011 WL 61631, at *3 (Tex. App.—San Antonio 2011, pet. denied) ("In balancing the equities, a trial court may compare evidence of harm that could result to the defendant and the public by granting the injunction with the evidence of harm to be sustained by the complainant if the court denies the injunction."); *Townplace Homeowners' Assoc., Inc. v. McMahon*, 594 S.W.2d 172, 176

**4.** **The Temporary Injunction Must Be Dissolved As It Fails to Preserve the Status Quo and Threatens the Entire Alabama Prospect as Well as Recovery for Any Party.**

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002). Status quo is defined as the "last, actual, peaceful, non-contested status that preceded the pending controversy." [150] The status quo in this case is the continued preservation and development of the Alabama Prospect.

The Court's temporary order not only fails to preserve the status quo, but it threatens to destroy the very asset from which any and all claims are to be paid. Undoubtedly, it is everyone's best interest for the Alabama Prospect to be preserved and fully developed.

By denying the merger of Petrodome Alabama II, LLC into Big Reef Energy, LLC, the Court has effectually split future funding from liability and ownership in violation of contractual requirements with the operator and other working interest holders. The effect is that Petrodome is arguably now in default of the Participation Agreement, and the entire Prospect is at risk. Specifically,

---

(Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) (upholding denial of injunctive relief where balance of equities showed that, if granted, defendants would suffer significant monetary harm and that, if denied, plaintiffs would likely suffer only minor harm).

[150] *State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex. 1975).

under the Participation Agreement, ownership of participation rights, and debts and liabilities for these participation rights, cannot be separated, as the court has done.[151]

Moreover, Seismic and 3-D rights are owned by Renpetco II, LLC.[152] As a mere licensee of this data, Petrodome cannot transfer these licensee rights to a third-party, except in certain limited circumstances, and with prior written permission of Renpetco.[153] Failure to pay current and ongoing seismic expenses will result in the loss of all rights and obligations under the Participation Agreement with respect to these rights, except those rights associated with previously drilled Prospects, and wells within those prospects that are in good standing.[154] A court ordered change of the seismic license will result in a loss of seismic rights.[155] Moreover, to be in good standing to exercise its Participation rights, Petrodome, is required to maintain a financially solvent condition.[156] In other words, by denying the merger, the trial court's temporary injunction order

---

[151] *See*, *e.g.*, RR Vol. 7, DX-5 (Participation Agreement) at pg. 9, Article 9 ("Debts or liabilities may not be assigned if they have been segregated from their associated Assets…).

[152] *See* RR Vol 7, DX-2, Exhibit B ("Seismic License Agreement").

[153] *See id.* at Section 12.

[154] *See id.* at Section 7.

[155] *See, e.g. id*. at Sections 12, 16.

[156] *See* RR Vol. 7, DX-2 (Renpetco Participation Agreement) at Pg. 2. In "Good Standing" is "being a *financially solvent* condition and conducting its business consistent with its normal practices and maintaining the Projects and AMI *without liens or breaches of this contract*.") (emphasis added). The "Good Standing" Requirement is found throughout the Participation Agreement. *See, e.g.*, Articles 2, 5.

effectively prevents Defendants from complying with the contractual requirements of the Participation Agreement and from proceeding to develop the Prospect.[157]

In addition to creating a state of perpetual noncompliance and default, the Court's temporary injunction has also effectively killed future funding of wells and further development of the prospect. By mandating that the interests stay in Petrodome Alabama instead of being allowed to be consolidated within Big Reef, the Court is giving license to the Defendants to potentially work mineral interests that they do not have clear title to. Even worse, the Court would be actively allowing them to solicit new funds from investors that they know may have ownership title problems. Issuing cash calls to investors and asking them to contribute to this potentially would open Defendant to claims of fraud by their investors. Investors must be assured clear title in order to fund further cash calls. No investor would and should be willing to contribute additional funds to a project when they cannot be assured of clear title.

Funding difficulties will arise when the investors see these cash calls and question how their interest will be secured. The only way for Big Reef to protect itself is to decline to participate until the lawsuits are all settled. This will lead to one prospect after another not being drilled to the detriment of all investors, all Defendants, and all Plaintiffs if they are ultimately successful in this suit. If Big

---

[157] *See id.*

Reef chooses not to participate in the first well, then it loses that identified prospect. Without continued funding of the wells and the project, the 40% working interest in the Alabama Project that innocents investors have paid millions for, will be lost, along with any potential recovery for any party.

That lost is real and immediate. The Participation Agreements provide that failure to participate in a proposed well and prospect within ten (10) days of a well proposal will result in a forfeiture of participation rights in that prospect.[158] Paragraph 3(a) of Exhibit "C" of the JOA, and Paragraph I of Article XV of the JOA,[159] both require payment with 15 days after billing receipt.[160] That deadline has now come and past.

The consequences are potentially disastrous for all parties, including Plaintiffs. Under the Participation Agreement, consent to participate in a proposed obligatory well, followed by a failure to pay for the well in accordance with the terms of the agreement, will result in a loss of all rights and obligations under the Participation Agreement.

In sum, without the merger of Petrodome Alabama II, LLC into Big Reef occurring, and the subsequent assignment of working interest to investors—who

---

[158] *See* RR Vol. 4 at pgs. 11-13; RR Vol. 7, DX-1 (Renpetco Well Proposal); RR Vol. 7, DX-5 (Renpetco Participation Agreement) at Art. 3.
[159] See RR Vol 7, DX-1 at pg. 17.
[160] *See* RR Vol. 7, DX-1.

paid millions of dollars for such interests—the development of the Alabama Prospect is terminally stalled, and potentially at risk of complete collapse. Certainly, if Defendants forfeited the rights to assignment of the 40% working interest, it would be a substantial economic detriment to Defendants, their partners, and other working interest holders. Under those circumstances, Plaintiffs would gain nothing and everyone else involved would lose everything invested in and anticipated from a successful project. Even the Plaintiffs would lose any opportunity to collect the monetary damages they seek in their petition. Accordingly, the temporary injunction must be dissolved as it falls to preserve and in fact changes the status quo.[161]

### B.    The Trial Court Abused Its Discretion by Setting a Low Bond.

The trial court also abused its discretion in setting a bond of $10,000 given the fact that Defendants, bona fide purchasers, and other third parties stand to lose potentially millions of dollars. The trial court is required to set a bond when it grants a temporary injunction. Tex. R. Civ. P. 683, 684. The applicant must post the bond, and it is payable to the adverse party if the temporary injunction is

---

[161] *See, e.g., Ballenger v. Ballenger*, 694 S.W.2d 72, 79 (Tex. App.—Corpus Christi 1985, no writ.) (finding that trial court erred in granting injunction which disturbed the status quo); *Edgewood Indep. Sch. Dist. v. Paiz,* 856 S.W.2d 269, 271 (Tex. App.—San Antonio 1993, no writ) (a trial court exceeds it authority if it enters a temporary injunction order that changes the status quo); *Barnstone v. Robinson,* 678 S.W.2d 562, 563 (Tex. App.—Houston [14th Dist.] 1984, writ dism'd) (same); *Gill v. Hudspeth County Conservation & Reclamation Dist. No. 1.,* 88 S.W.2d 517, 519 (Tex. Civ. App.—1935) (reversing temporary injunction where temporary injunction did not preserve the status quo, but in truth changed the same).

dissolved at trial. *See id.* The purpose of a bond is to provide protection to the enjoined party for any possible damages occurring as a result of the injunction. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 679, 686 (Tex. 1990); *Bayoud v. Bayoud,* 797 S.W.2d 304, 312 (Tex. App.—Dallas 1990, writ denied).

In order to protect the interests of Defendants and their investors, a bond of at least $9 million dollars should have been required—the purchase price of the right to an assignment of a 40% working interest in the Alabama Prospect and necessary working capital. Without that purchase and those investors there is no Alabama Project. There is no participation in the first well or the money to fund the first well. Plaintiffs cannot and should not be able to claim a corporate opportunity without having to put up that amount.

Moreover, Plaintiffs' temporary injunction has effectively halted the development of the Prospect, and now threatens to kills the Prospect altogether. Defendants and investors stand to lose not only the $7.5 million used to purchase the Prospect, but potentially millions of dollars in revenue and profit that could potentially flow from the Prospect. Appellees are in essence enjoying a free ride, and are betting on other people's money.

Should the Project prove unfruitful, Appellees will quickly disavow any claimed corporate opportunity. Defendants and the investors will be unable to recover from these financially defunct entities.

A bond of $10,000 is clearly insufficient and should be reversed, given that Defendants and innocent third-party stand to lose $7.5 million in actual damages, in addition to potentially millions more in lost profits and revenues due to delay or loss of the Project altogether. Where, as here, the evidence shows that the potential damages to be suffered exceed the amount of the bond, the bond is insufficient. *See GTE Mobilnet of South Tex. Ltd. Part'p v. Cellular Max, Inc.,* 123 S.W.3d 801, 804 (Tex. App.—Beaumont, 2003, pet dism'd) (reversing trial court's bond of $1,000 finding bond insufficient to cover potential damages for wrongful injunction); *Biodynamics, Inv. v. Guest*, 817 S.W.2d 128, 131 (Tex. App.—Houston [14th Dist.] 1991, writ dism'd by agrmt); *Franklin Savs. Ass'n v. Reese,* 756 S.W.2d 14, 16 (Tex. App.—Austin 1988, no writ) (trial court abused its discretion in setting $10,000 bond in case enjoining the sale of property; trial court should have taken into account value of property enjoined along with potential losses resulting from inability to develop property during the term of the injunction).

## IV. PRAYER

The trial court abused its discretion when it entered the temporary injunction. Therefore, Appellants respectfully asks the Court to reverse the trial court's November 21, 2014 Order, modify and/or dissolve subsections (a)-(f) of the temporary injunction, and grant Appellants any and all other relief to which they are entitled or that the Court deems just and proper.

_R. Laurence Macon_

_____
LAURENCE MACON
Texas Bar No. 12787500
lmacon@akingump.com
JANIE A. SHANNON
Texas Bar No. 00797416
jshannon@akingump.com
DENNIS WINDSCHEFFEL
Texas Bar No. 24047127
dwindscheffel@akingump.com
AKIN GUMP STRAUSS HAUER & FELD
LLP
300 Convent Street, Suite 1600
San Antonio, TX 78205
Tel:  (210) 281-7000
Facsimile:  (210) 224-2035

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing document was served by email, certified mail-return receipt requested, and/or facsimile on February 6, 2015 to the following:

Reagan W. Simpson
Christian J. Yard
Yetter Coleman LLP
909 Fannin, Suite 3600
Houston, Texas 77010


Roger S. Braugh, Jr.
Jason P. Hoelscher
Brantley W. White
Craig M. Sico
Sico, White, Hoelscher, Harris & Braugh LLP
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401


Attorneys for Appellees



_____
**R. LAURENCE MACON**

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4(I)

The undersigned hereby certifies that, based on the word count of the computer program used to prepare this document, the document contains 14,515 words.

_____
**R. LAURENCE MACON**